## 10928

### STATE v. TINDALL *ET AL.*

(113 S. E., 691)

1. CRIMINAL LAW—CIRCUMSTANTIAL EVIDENCE NEED NOT CONTAIN ANY ONE FACT SUFFICIENT ALONE TO CONVICT.—An array of circumstantial evidence need not contain any one fact sufficient in itself to warrant a conviction, if, taken as a whole, the evidence is such as to produce a belief of defendant's guilt.

2. LARCENY—EVIDENCE HELD TO WARRANT CONVICTION.—In a prosecution for stealing an automobile, although there was a discrepancy between the date when the car was stolen and the date when certain witnesses testified to having sold the accused gasoline, presumably during their flight, it was a mere incident or detail such as would not make a lasting impression, and evidence held sufficient to warrant conviction.

3. CRIMINAL LAW—ERROR IN COMMENTS BY PROSECUTING ATTORNEY NOT REVIEWABLE, WHERE RECORD DISCLOSES NO FACTS.—An assignment of error in permitting the prosecuting attorney to comment to the jury on defendants' failure to offer any testimony is not reviewable, when the facts are not disclosed by the record.

4. CRIMINAL LAW—INSTRUCTION THAT CIRCUMSTANTIAL EVIDENCE WHICH CONVINCES IS GOOD IS NOT ERROR.—An instruction that circumstantial evidence which produces conviction is as good as positive evidence is not error.

5. CRIMINAL LAW—INSTRUCTION HELD NOT ERROR AS INDICATING COURT'S OPINION.—In a prosecution for the theft of an automobile, an instruction relative to the presumption existing against one found in possession of stolen goods is not error, as indicating to the jury that the court thought defendants were guilty, where the evidence tended to show that defendants stole the car.

Before GARY, J., Florence.  Fall Term, 1921.  Affirmed.

R. Lawrence Tindall and L. J. Miller indicted for the theft of an automobile, and upon conviction, appealed.

The following is a transcript of the evidence relied on for conviction:

R. B. Gardner testified on direct examination:

On the 5th day of May, 1921, I was living at 510 East Evans street, Florence, S. C.  I was the owner of a Ford coupé about four weeks old.  I paid $821 for it; used it on that morning.  When I went to work about 3 o'clock I left the car standing in front of the house, and when I came to supper, about 7 or 8 o'clock, my wife and mother had left for the moving pictures, and when I left I drove the car to the garage and locked it and took the key out.  When I came home from work that night, I didn't go to the garage to find out about the automobile.  That was about 11 o'clock. I didn't get up next morning until 11 o'clock.  I got up and went out to get the car, and the car was gone.  That was 10 minutes after 12 next morning.  I didn't have any idea where the car went, or anything about it.  That was Thursday morning.  I went to Mars Bluff Ferry, and I found

that no car had passed there that morning, and I went to Darlington that afternoon. I came back home and left on Saturday morning. I left here and went to Darlington, and from Darlington I went to Society Hill, and at Society Hill I talked with the fellows who sold gasoline and oil, but none of them had sold anybody any gas. I started on to go to Cheraw, and I went about 2½ miles above Society Hill, where R. A. Linton lives—he sells gas and oil. I inquired if he had sold anybody any gas early that morning. I found that he had sold gas, and I went from there to Cheraw. I inquired up in town, and couldn't get any trace of anything. I started to Charlotte, and as I was coming out Mr. Baker, who runs a garage on the highway just before you cross the river—he sold gas—and I found that he had sold some gas, and I went to Rockingham and down to the Ferry, seven miles below Rockingham, and nobody had crossed there that day the car left home. I concluded the car didn't go towards Charlotte, but it had come towards Greensboro and High Point. I went from Rockingham to Ashboro, N. C., and from Ashboro to Winston-Salem, and back to Greensboro, and from Greensboro back home. I still didn't have any trace of it. Two men were described to me by a man that sold gas, and I inquired if there had been two fellows of that description around here, and I found out there had been Mr. Miller, cook at the Greasy Pig, a little restaurant back of the Union Drug Store, and put up at the Pee Dee Hotel, which is a half block from my home on the corner of Evans and McFarlan streets. I found out where that party had gone, and got on the train and went to Fayetteville, N. C., and found Mr. Miller and had him arrested.

Q. Is that the man, L. J. Miller? A. Yes; I called up the chief of police, and he said he would send a man on 82 to see if that was the same fellow. It was; and I had them brought back to Florence County, and got these men

that sold them gas and brought them here to see if they could identify them, which they did. Mr. Baker came down here and went in the jail. He identified Miller; picked him out in a bunch. The other man was not in the jail at that time. I didn't get him. Mr. Baker did not identify Tindall. The gentleman from Society Hill did. I was present. He identified Tindall and Miller, but Mr. Baker only identified Miller. I got my car back at Greensboro, N. C. I got it from a plumber in Greensboro, and I learned he got it from the C. & H. Motor Co. They described the man that sold it to them, and they got the man. It was the last man that couldn't account for where he got the car. Miller roomed at the Pee Dee Hotel. . That was about as far as the street from my home. That's about all I know.

### Cross-examination by Mr. Baker:

Q. You found your automobile in Greensboro in the possession of a man not connected with these parties? A. I don't know.

Q. The man in whose possession—whom you just testified couldn't account for where he got it from, was neither Mr. Miller nor Tindall? A. Neither one.

Q. I believe you stated the man in whose possession it was traced to in Greensboro made no mention of either of these defendants and couldn't give any explanation of where he got it from? A. I don't know whether he could or not. I know he didn't do it.

Q. Under what circumstances was Mr. Tindall identified by Mr. Baker. He was carried to the place where he was in the cell, and Mr. Tindall was in the cell by himself, and he was told what Mr. Tindall was in there for? A. Yes; he was in a cell to himself.

Q. When Mr. Linton saw him in there, he identified him as the man he had sold the gasoline to? A. Yes.

J. L. Myers, sworn, testified on direct examination:

I live in Florence. I was living here last May. I run the Pee Dee Hotel. I know this man Miller. He roomed at my hotel. He came with me about April 18th, and left on the 26th.

Q. Did you see the other man there? A. Yes; I have seen him but he didn't stop with me.

Q. Did you ever see him and the other man together? A. No, sir. He left my hotel the 26th of April. I didn't see him any more after that. I do not know anything about the automobile.

R. B. Gardner, recalled, testified on direct examination:

Mr. Gardner, the man in whose possession you found this automobile at Greensboro, who did not give any explanation of where he got it from, is now under indictment in this Court for the larceny of the same automobile? A. Yes; his name is Harry Hall.

T. B. Baker testified as follows on direct examination:

On the second day of last May I was living in Cheraw. I was engaged in the business of automobile mechanic. I ran a service station in regard to oil and gasoline in the city of Cheraw.

Q. Did you ever see either of these men before? A. I saw that one, Miller. I saw him in Cheraw on the morning of the 3d of May. I got up early and started down to the store, and I saw a car come around the corner. It was a Ford coupé. I noticed it stopped on the corner, and the driver looked at the signs. I started to go and tell him and he drove off, and I went and got a man, and went on down to the garage and opened up, and within half an hour this fellow came back and wanted a can of gas. I said, "You'll have to put up a deposit for the can"; and he gave me a deposit of $2, and I said, "I'll carry it for you on a car," and he said, "I've been stooped up riding around, and lost my way around Chesterfield and I'll carry it." I asked him where he was going and he said towards Fayetteville. I don't remember now what he said. He walked off with

the can, and I noticed his appearance walking off, and when I saw him here the back of his head was turned to me, and when he turned I recognized him being the same. I recognized him.

Q. When you first saw him, he stopped out there in the car? A. Yes; I couldn't recognize him then.

Q. Was there anybody in the car with him? A. Yes; I didn't see who it was. He came back in about half an hour. He didn't have the car then. He walked back and bought a can of gasoline. He said the car was over the river. Me and my wife rode over there, and I found my can lying by the side of the road, the same can I let him have. I was satisfied that was the same man that stopped in the Ford coupé. I couldn't recognize the other man.

*Cross-examination by Mr. King:*

That was early in the morning. That was the only time I ever saw that party.

R. A. Linton testified on direct examination:

I live near Society Hill. I was living there last May. I run a service station for gasoline and oil.

Q. You remember on the 2d day of May, or the morning of the 3d or 2d, having furnished some gasoline or oil to a car? A. Yes.

Q. Now, tell what happened in your own way. A. Two men came up and called me out; wanted some gas and oil. That was 4 o'clock. I got up and went out and let them have it.

Q. What kind of car? A. Ford coupé. There were two men. Both of them got out and came in the store. I had lights. Yes; those are the same two men. They came in my store. I saw them after that in jail. I recognized them then. Mr. Gardner stopped at my place and talked with me. That was on the Saturday following. I described the men to him.

Q.   Did you take enough notice to be able to describe to him the two men?   A.   I think I did.

Q.   You are certain that these are the two men that stopped with the Ford coupé that morning and got gasoline from you?   A.   Yes.

*Cross-examination by Mr. Baker:*

That was the first time that I know of that I saw Mr. Tindall.

Q.   That was the first time, until you came to the Florence County jail and you were shown this man in a cell as Mr. Tindall?   A.   Yes.

Q.   And from having seen him one morning you recognized him in jail as the man that had been arrested for stealing this automobile?   A.   Yes.

*Cross-examination by Mr. King:*

I had never seen Miller before that I know of.

Q.   You were brought down, and the parties said, "This is Miller;" and you said, "Yes"?   A.   No; I picked him out of the crowd.   He was put in the crowd.

D. H. McLaughlin testified on direct examination:

Q.   Where were you living on the 2d or 3d of May?   A.   In Florence.

Q.   At that time, or prior to that time, did you ever see one of these men?   A.   Yes; I saw both of them.

Q.   Were they together when you saw them?   A.   I have never seen one unless the other was with him.

Q.   Where did you see them at?   A.   At the restaurant right across the street from me.   I would see them as I would pass back and forth by them in that restaurant.

Q.   You say these two men are the ones you saw?   A.   Yes.

Q.   Do you recall when was the last time you saw them?   A.   I heard about this car being stolen, and began to tell about the description of these two men.   I remember it

came to me right away that I had seen these two men in town the night previous to the car being stolen and since then I didn't see them at all.

*Cross-examination:*

Q. Did you see them the day the car was stolen? A. As well as I remember, I didn't see them, except that night.

Q. That particular night you recall you saw them? A. It was some time about 8 or 8:15, I remember. I went to the house that night, and I remember the time.

Q. Where did you see them? A. Right by the Union Drug Store.

Q. Do you remember any other occasion that you saw them about the Union Drug Store at 8 o'clock? A. I have seen them on several occasions, passing back and forth.

Q. That is the only night you can remember as to dates? A. The last time I saw them, and naturally remember the car being stolen that night.

Q. When did you hear about the car being stolen? A. The day after it happened.

Q. As I understand you, having the mind of a detective, it immediately recurred to your mind having seen these two men when you heard the car had been stolen? A. No, sir; this party had been fired from this restaurant, and had been continually walking around, both of them together, for some time before they left. Two or three days before the car had been stolen, and the night the car was stolen I was going up the street, and I saw both of these parties passing the drug store. The reason I was so particular to notice them was because the young fellow working across in the restaurant that I knew was expecting some trouble from this fellow Miller.

Q. How did you know they had been out of town two or three days? A. I didn't know it; only I didn't see them.

Q. They were the only people that had lost jobs in Florence? A. Not that I know of.

Q. How long had it been before this particular night you claim that you saw them at the Union Drug Store since you had seen these defendants? A. Two or three days; I don't remember exactly. A number of days; two or three days or a week.

Q. Do you know that this car was found in the possession of another party, a party other than either of these defendants, in Greensboro? A. Yes.

Q. And that party is under indictment in this same Court for the larceny of that automobile? A. Yes; I was with him when he found the car.

Q. Out of all the people in Florence who come and go, you remember these two parties on that particular occasion at 8:15 o'clock? A. I won't say as to the exact time, but it was about 8:15.

*Re-direct Examination:*

Q. Explain why you remember that night. A. I was living right across the street, and this young fellow Graham was a friend of mine, and Miller had lost his job in the restaurant as cook, and Graham stopped me one day (interrupted).

Q. In pursuance of what he told you, what did you do? A. I sat around the restaurant, expecting some trouble with Miller, so I could help this fellow out, as he was by himself. Then, when this automobile disappeared, two or three days after that I saw them in town on this particular night, and I noticed them, and I said, "I wonder if they are going to get after that boy now." I lost my automobile in June. It was after these parties had been arrested, and it was several days, about three or four days, before we found the car in Greensboro.

Q. You know another man was indicted for stealing the automobile—you know whether he was indicted for stealing the automobile or receiving the automobile? A. I

don't know how the warrant is worded, but he is held in connection with this car.

C. A. Bateman, sworn, testified on direct examination:

I live in Florence. I am a policeman. I went to Fayetteville. When I saw Miller at Fayetteville, I didn't see Tindall.

Q. When had you seen him in Florence? A. The last time I remember seeing Miller, it was the 26th or 27th of April. I recall hearing about the automobile being stolen.

Q. You remember seeing him the night before? A. No, sir; I didn't see L. J. Miller that night. I saw the other man.

Q. Where did you see him? A. At the depot, about half past six. I didn't see Miller that night.

Q. You know that both of these parties were in Florence? A. Had been for some little time.

*Cross-examination:*

Q. How often had you seen Mr. Tindall? A. I saw him there on the street in the day, up until I went off duty at 8 o'clock, riding around in a transfer car. I asked him what he was doing here, and where he came from. I inquired and found out he was not working, and I told him he would have to get a job or get off the street. That night, or the next night, Mr. Turbeville, the man that relieved me, went on duty. I think he picked him up and brought him in for vagrancy on the street.

Q. What night was that? A. Must have been about two weeks before the car was alleged to have been stolen.

Q. Was the case against him for vagrancy dismissed? A. I think so.

Q. When did you see him; the night before this car was stolen? A. Yes; on Wednesday night before the car was stolen I saw him at the station. I just spoke to him and passed right by him.

Q.  What time did you get off duty?  A.  At 8 o'clock I reported off duty at the New York Café.. I must have been about 8:30 when I came home; he walked by me, and I said, "Good evening," and he said, "Good evening."

*Cross-examination by Mr. King:*

Q.  The last time you saw Miller was about the 26th? A.  26th or 27th, about that time; from the 26th to the 1st of May.

Q.  If parties would swear that Miller was in Charleston from the 27th of April to the 9th of May, and was there continuously, you would say that you had not seen him after the 27th?  A.  I said 26th or 27th, about along in some of those dates.

Q.  The 26th is just as accurate as any other day in your mind?  A.  26th or 27th.

Q.  Did you see him during the week?  A.  No; I didn't see him any more.

Q.  Did you see him anywhere from the 26th to the 1st? A.  The 26th or 27th.  I saw him in front of the hotel; I don't remember seeing him any more.

The defendants' exceptions are as follows:

(1)  That the presiding Judge erred and failed to exercise a sound judicial discretion in overruling the appellants' motion for a new trial on the ground that there was no evidence whatsoever adduced upon the trial to sustain the verdict found against the defendants.

(2)  That the presiding Judge erred and failed to exercise a sound judicial discretion in overruling appellants' motion for a new trial on the ground that he allowed the solicitor for the State, during his address to the jury, over objection of appellants, to comment upon the fact that the defendants had offered no testimony, in that by such comment the defendants were deprived of their right to rest their case wholly upon the plea of not guilty.

(3) That the presiding Judge erred in charging the jury as follows, to wit: "There is another way, and that is by producing a circumstance here and a circumstance there which, when linked together, point directly to the guilt of the defendant and in no other direction; and if the State has produced evidence of that kind, convincing you that these parties are guilty, it is just as good as if they had produced some witness who saw them steal the car"—in that he thereby in effect charged the jury that the defendants did steal the car, and the only question was the kind of proof offered by the State to prove that fact, in that he did thereby charge on the disputed facts of the case in contravention of Article 5, Section 26, of the Constitution of South Carolina.

(4) That the presiding Judge erred in charging the jury as follows: "If the State has surrounded these defendants with a chain of circumstances which, when linked together, point directly to the guilt of the prisoners, and to no other direction, and it carries conviction to your mind, it is just as effectual as if they produced some man that saw them go into the garage and drive off the car"—in that by the use of those words he thereby charged the jury, in effect, that the defendants did go into the garage and drive off the car alleged to have been stolen; the same being in effect, a charge on the main disputed facts in the case, and in contravention of Article 5, Section 26, of the Constitution of South Carolina.

(5) That the presiding Judge erred in charging the jury as follows, to wit: "If the State has surrounded these defendants with a chain of circumstances which, when linked together, point directly to the guilt of the prisoners, and in no other direction, and it carries conviction to your mind, it is just as effectual as if they produced some men that saw them go into the garage and drive off that car"—in that he did thereby charge the jury that circumstantial evidence is just as good as direct evidence, which is not a correct principle of law.

(6) That the presiding Judge erred in charging the jury as follows, to wit: "If the State has surrounded these defendants with a chain of circumstances which, when linked together, point directly to the guilt of the prisoners, and in no other direction, and it carries conviction to your mind, it is just as effectual as if they produced some man that saw them go into the garage and drive off that car." He did thereby lay down a false standard as to circumstantial evidence, in that he failed to instruct the jury that such evidence must not only point directly to the guilt of the accused, but it must go farther; that is to say, it must point directly, unmistakably, and conclusively to the fact, so that no other conclusion except the guilt of the accused can reasonably be arrived at.

(7) That the presiding Judge erred in charging the jury as follows: "Now, I ought to tell you that, when one is seen in possession of stolen goods recently stolen, he is presumed to be the thief until he has satisfactorily explained his possession of it. Let me repeat that to you. When one is found in possession of stolen property recently stolen, he is presumed to be the thief until he has satisfactorily explained his possession of it"—in that he did thereby charge the jury a principle of law which had no application to the facts adduced on the trial (there having been no evidence whatsoever introduced showing or tending to show that the property alleged to have been stolen was ever in possession of defendants), and such language from the Judge could only have had the effect of leading the jury to believe that the Judge believed that such evidence had been adduced, which necessarily tended to mislead the jury to the serious prejudices of the defendants' rights.

*Messrs. A. L. King,* and *McNeill & Oliver,* for appellants, cite: *Circumstantial evidence:* 90 Miss., 461. *Not sufficient identity of property:* 108 S. C.,107; 107 S. E., 906; 110 S. E., 78.

*Mr. L. M. Gasque,* Solicitor, for the State cites: *Solicitor can comment on failure of proof of defense:* 75 S. E., 338; 90 S. E., 376; 12 Cyc.; 578; 83 S. E., 65; 91 S. C., 562. *Defendants must show prejudice:* 26 S. C., 117. *Judge can mention facts proven by witnesses on both sides:* 77 S. E., 721.

July 5, 1922.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

The defendants were tried under an indictment charging them with larceny of one Ford coupé, of the value of $820, the property of R. B. Gardner. The testimony on the part of the State was wholly circumstantial, and none was introduced in behalf of the defendants. The jury found the defendants guilty; they made a motion for a new trial which was overruled, whereupon his Honor, the presiding Judge, sentenced them to serve five years at hard labor in the State penitentiary. The defendants appealed upon exceptions, which will be reported. They will be considered in regular order.

First Exception: As the testimony is circumstantial and consists of quite a number of details, the question presented by this exception cannot be properly considered without its reproduction in the report of the case.

While it is true there was no direct and positive testimony sustaining the allegations of the indictment, still there were facts and circumstances amply sustaining the verdict of guilty. The rule in such cases is thus stated in *Railroad v. Partlow,* 14 Rich., 237, and quoted with approval in *Dantzler v. Cox,* 75 S. C., 334; 55 S. E., 774.

"It may be that no one of the facts would, of itself, warrant the inference, and yet, when taken together, they may produce belief, which is the object of all evidence."

In 1 Greenl. Ev. § 51a, it is said:

"It is not necessary that the evidence should bear directly upon the issue. It is admissible if it tends to prove the issue, or constitutes a link in the chain of proof, although alone it might not justify a verdict in accordance with it. This is usually the case where an issue depends on circumstantial evidence."

The main circumstance upon which, it seems, the appellants rely, is that the time when they were seen by the witnesses T. B. Baker and R. A. Linton at Society Hill and Cheraw, while they were driving an automobile, was prior to the time when the prosecutor's Ford coupé was stolen, and therefore it was necessarily a different car. The witnesses T. B. Baker and R. A. Linton testified that they saw the defendants on the 2d or the morning of the 3d of May, 1921, while the prosecutor testified that his car was stolen on the night of the 5th of May.

Whether the witnesses Baker and Linton saw the defendants in a car on the morning of the 3d of May, or whether the prosecutor's car was stolen on the night of the 5th of May, are mere incidents, which would not be apt to make as lasting an impression as the fact of seeing the defendants at Cheraw and Society Hill, or the fact that the prosecutor's automobile was stolen. Every physical fact in the case tends to show that the car which Baker and Linton saw was the Ford coupé which was stolen from the prosecutor.

In the first place the car which was seen at Society Hill and Cheraw was a Ford coupé. The defendants acted suspiciously. Miller told Baker, when asked, that he was going towards Fayetteville. He and Tindall did go to Fayetteville, where they were arrested, carried to Florence, and there identified by the witnesses Baker and Linton. While the defendants were at Fayetteville, the prosecutor's car was also found there; furthermore, it was traced to a person who could not give a satisfactory account of the manner in which he came into its possession.

The entire testimony of the witness D. H. McLaughlin is very important, especially the part which shows that the defendants were in Florence the night the prosecutor's car was stolen. The testimony shows that the only reasonable inference is that the stolen car was carried to Fayetteville by the defendants and there sold. The defendants' surroundings and manner of life were such as to subject them to great temptations. We shall not further discuss the testimony in detail, as it will be reported and speaks for itself.

Second Exception: The facts upon which this exception is predicated do not appear in the record.

Third Exception: His Honor, the presiding judge, in effect charged the jury that circumstantial evidence which producd conviction, is just as good as positive evidence, and in this there was no error.

Fourth, fifth, and sixth exceptions: What was said in considering the third exception disposes of these exceptions.

Seventh exception: There were numerous facts and circumstances tending to show that the defendants stole the car. His Honor, the circuit Judge, submitted such facts to the jury, and properly charged the law in regard to the possession of property recently stolen.

Affirmed.